# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

CIBOLA ENERGY CORPORATION,

        Plaintiff

v.                                         Case No. 12-cv-1099 MCA/LFG

UNITED STATES DEPARTMENT
Of INTERIOR, et al.,

        Defendant.

## **MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on Plaintiff Cibola Energy Corporation's action for judicial review of a decision by the United States Department of the Interior's Board of Land Appeals (IBLA), filed with this Court on October 24, 2012. [Doc. 1] The appeal is pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 701-706, which provides for judicial review of final agency decisions. The parties provided the Court with briefing. *See Opening Brief of Cibola Energy Corporation* [Doc. 18]; *Answering Brief of Federal Defendants* [Doc. 21]; *Plaintiff's Reply Brief* [Doc. 24]. Having considered the parties' arguments, the Administrative Record, the relevant law, and being otherwise fully advised of the premises, the Court AFFIRMS the IBLA decision. The Court is persuaded that the IBLA's decision is well supported by evidence in the record and that the IBLA considered all of the facts before it, provided reasoned bases for its conclusion, and was not otherwise arbitrary and capricious.

1

## BACKGROUND AND PERTINENT REGULATIONS

43 C.F.R. § 3162.4-2 is part of the Regulations Relating to Public Lands under which the Bureau of Land Management (BLM) operates. It relates to onshore oil and gas operations and regulates samples, tests, and surveys of wells. § 3162.4-2. Subsection (b) provides that "[a]fter the well has been completed, the operator shall conduct periodic well tests which will demonstrate the quantity and quality of oil and gas and water. The method and frequency of such well tests will be specified in appropriate notices and orders. When needed, the operator shall conduct reasonable tests which will demonstrate the mechanical integrity of the downhole equipment." § 3162.4-2(b).

Cibola is the operator of Ysletano Canyon Federal No. 1 Well (Well). The Well is located on lease NMNM-38313, which Cibola holds by assignment. This action requires the Court to determine whether the IBLA acted arbitrarily and capriciously when it affirmed the BLM's decision ordering Cibola, pursuant to § 3162.4-2(b), to conduct casing integrity (CIT) and production tests on the Well under the following facts.

Generally, to maintain an oil and gas lease, a well must be in production. *See* 43 C.F.R. § 3107.2-3; 43 C.F.R. § 3162.3-4. Categorizing a well as "temporarily abandoned" (TA) allows a lessee to avoid the termination of a lease, even when a well is not currently producing. § 3162.3-4; *Coronado Oil Co.*, 164 IBLA 309, 321-23 (2005). Even a well that is not producing must be capable of producing in paying quantities to avoid the termination of its lease. *Coronado Oil Co.*, 164 IBLA at 324.

This Well was completed in 1990 and has never produced. [AR 98, AR 85, Doc. 18 at 3] It was last tested for production in 1990[1] and was shut in thereafter. [AR 98, AR 85] The initial test indicated that production was "marginal." [AR 85] These facts are not contested by the parties. Cibola did not apply for TA status until March 2002. [AR 72] On March 11, 2002, Cibola performed a casing integrity test, which was witnessed by the BLM. [AR 72, AR 77]. The Well was granted TA status for the period of one year. [AR 72] In 2003, Cibola again applied for TA status, and it was granted for a 12-month period ending on March 11, 2004. [AR 70] Between 2004 and 2011, Cibola did

---

[1] There appears to be confusion in the record and in the briefing as to when and for what purpose the Well was last tested. For instance, the February 15, 2012 State Director Review Decision states that the "most recent CIT and production test . . . was approximately 10 and 20 years ago respectively." [AR 365] The IBLA decision states that Cibola tested the Well on July 16, 1998, and in October 2001 and March 2002, and states that "on each occasion [Cibola] found that the well was capable of production in paying quantities, and that the casing remained intact." [AR 522] However, the Government indicates that the last production test occurred on February 18, 1990. [Doc. 21 at 8] After reviewing the record, the Court determines that the State Director and the Government are correct. Cibola has embraced the IBLA finding, which is not supported by the record. *See, e.g.,* [Doc. 18 at 3] The record shows that the last time the Well was tested for production was for one hour on February 18, 1990, [AR 98] and that it was only tested for integrity in 2001 and 2002. [AR 239, 70, 77] Searching the record, the Court finds no other evidence of testing for production capability. The only record relating to July 16, 1998 that the Court found is a letter from the BLM to Cibola alerting Cibola that the BLM required proof of production capability if Cibola was to maintain the lease on the shut-in well. [AR 85] This letter references the Well's previous production testing, and described it as "marginal," but clearly is not proof that production testing was completed on July 16, 1998, the same day it was requested. The Court also notes that Mr. Yates testified that the Well was plugged "above the pay" in 1995, and that subsequently Cibola had done casing tests. [AR 553] Accordingly, it appears from the record that no testing was conducted in 1998, and rather, after conversation with the BLM, the Well was continued in shut-in status. *See* [AR 85] The documents regarding the 2001 and 2002 tests indicate that the Well was only tested for casing integrity on those occasions. [AR 85, 70, 77, 239] The Court recognizes that, because the BLM granted the Well TA status in 2002 and 2003, it thus implicitly considered it capable of producing in paying quantities at those times.

3

not again apply for TA status, but it is undisputed that Cibola continued to pay shut in royalties to the government throughout that time. [Doc. 18, pg. 4; Doc. 21, pg. 4; AR 522; AR 247]

In May 2011, the BLM sent Cibola a letter. [AR 58] It had reviewed its files and, noting that the Well had not produced since it was completed on February 19, 1990, informed Cibola that to maintain its lease, the lease must contain a well capable of producing oil or gas in paying quantities. [AR 58] The BLM stated that it had determined the "lease [wa]s not capable of production in paying quantities." [AR 58] This letter was rescinded on June 20, 2011, after counsel for Cibola met with the BLM and after Cibola filed a notice of staking for an oil well on the same lease. *See* [AR 51, 46-50] In a June 20, 2011 letter, the BLM indicated that Cibola was to prepare a Sundry Notice requesting TA status for the Well. [AR 51]

On June 23, 2011, Cibola prepared a Sundry Notice seeking TA status for the Well. [AR 36] On September 13, 2011, the Las Cruces District Office (LCDO) issued a decision noting that the Well had been shut-in since its casing integrity was last tested in 2002 and explaining that "[t]he Authorized Officer requires testing in order to determine if the Temporary Abandonment can be continued." [AR 10] The LCDO thus deferred its decision on Cibola's Sundry Notice until the testing could be completed. [AR 10] The LCDO's decision was accompanied by a Notice of Written Order which stated that the Well had been in TA status since 2002 and was last tested in that same year and that a "significant number of years had passed by without any further testing of the casing integrity or the well's capability of being a paying well." [AR 12] It ordered Cibola to

4

conduct a CIT test and, if that test was positive, to conduct a production test. [AR 12] Both the Decision and Written Order cited § 3162.4-2(b). [AR 10, 12]

Cibola requested State Director Review of the Decision and Order. [AR 1] The State Director issued a decision (SDR) on February 15, 2012. [AR 364] The SDR upheld the Decision and Written Order on the ground that federal regulations provide the BLM with authority to require testing in order to determine whether a well's TA status should be continued and cited to § 3162.4-2(b) and 43 § 3107.2-3.[2] [AR 365] It noted that the most recent production and CIT tests on the Well were 20 and 10 years ago respectively, and reasoned "[a]s many years have passed, the LCDO is meeting its obligation to properly administer oil and gas leases by requiring the current testing prior to making a decision on whether to approve Cibola's Sundry Notice." [AR 365]

Cibola appealed the SDR to the IBLA. [AR 360] The IBLA held a hearing on December 16, 2011. Mr. Harvey Yates of Cibola Land Corporation (previously Cibola Energy Corporation) was the only witness to testify. *See Transcript* [AR 550-565] His testimony largely related to his plans for oil and gas development in Otero County and the reasons this Well had not been developed. There was no testimony specifically about the condition of the reservoir, although Mr. Yates testified that no gas was being produced in Otero County and it was established no other leases in the area had been

---

[2] § 3107.2-3 provides that "[n]o lease for land on which there is a well capable of producing oil or gas in paying quantities shall expire because the lessee fails to produce the same, unless the lessee fails to place the well in production within a period of not less than 60 days as specified by the authorized office after receipt of notice . . . to do so. Such production shall be continued unless suspension of production is granted by the authorized officer."

granted since at least 1997. [AR 555, p. 20 ln. 25 – p. 21 ln. 1; AR 558 p. 31 lns 17-20] Regarding the condition of the Well, Mr. Yates offered to have the well casing tested, and explained the procedure required to test the production capability. However, given that the Well would not be producing, Mr. Yates stated that he did not know what additional production testing would accomplish. [AR 556, p. 22, ln. 1-9]

On June 25, 2012, the IBLA issued its Order upholding the SDR decision. *Cibola Energy Corporation*, IBLA 2012-110. [AR 519] Cibola commenced this action for judicial review of the IBLA decision on October 24, 2012. [Doc. 1]

The parties agree that the BLM has the authority to order testing pursuant to the regulation, but Cibola contends that to do so on the facts in the record was arbitrary and capricious. It asks this Court to reverse the IBLA decision and allow the Well to continue in TA status without further testing. [Doc. 24 at 14]

### STANDARD OF REVIEW

As our Tenth Circuit succinctly stated,

> Under the Administrative Procedure Act, [a court] can reverse agency action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' 5 U.S.C. § 706 (2)(A). This standard requires [the court] to determine whether the agency considered the relevant data and rationally explained its decision. Under this standard [a court] will not disturb an agency action unless the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that is could not be ascribed to a difference in view or the product of agency expertise. If the agency's path may reasonably be discerned from its explanation, [a court] will not disturb the action even when the explanation is not entirely clear.

6

*WildEarth Guardians v. United States Envtl. Protection Agency*, 770 F.3d 919, 927 (10th Cir. 2015) (internal quotation marks and citations omitted).

In short, under the arbitrary and capricious standard, the court must "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (footnote omitted). The "arbitrary and capricious standard focuses on the rationality of an agency's decisionmaking process rather than on the rationality of the decision." *Id.* at 1575. "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself" and "the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record." *Id.* (internal quotation marks and citations omitted); *IMC Kalium Carlsbad, Inc. v. Interior Brd. of Land Appeals*, 206 F.3d 1003, 1009 (10th Cir. 2000). The Court applies this deferential standard of review to the IBLA's decision. *IMC Kalium Carlsbad, Inc.*, 206 F.3d at 1010.

Under the arbitrary and capricious standard, the scope of a district court's review is "narrow," but a district court must "conduct a plenary review of the record to ascertain whether the agency's action was supported by 'substantial evidence.'" *Olenhouse*, 42 F.3d at 1576. The court must "consider conflicts in the record and define, specifically, those facts which it deems supportive of the agency decision if that is the court's resolution in the matter." *Id*. (internal quotation marks and citation omitted). The district court must delve into the record and "cannot rely on counsel's statements as to what was in the record." *Id*.

Applying these standards, the Court reviews the IBLA decision to determine whether it was supported by substantial evidence and was not arbitrary and capricious.

**ANALYSIS**

Cibola argues that the IBLA failed to provide a reasoned and factual basis for its decision. [Doc. 18 at 10] It contends that the decision "cites only the passage of time as supporting the determination that the well must be retested, but under the circumstances of this case, the passage of time, without more[,] is factually and therefore legally insufficient to provide a rational basis" for the IBLA's decision. [*Id.*] It contends that the record fails to disclose any facts indicating that the Well should be tested now. It asserts that "[t]he conditions downhole remain exactly as they existed when the [W]ell was completed as capable of producing in paying quantities." [*Id.* at 12] In Cibola's estimation, there are no circumstances or conditions that have changed since the Well was last tested and found to be capable of producing paying quantities of gas. Cibola argues that the IBLA failed to consider that there is no evidence that conditions have changed, and therefore the BLM's § 3162.4-2(b) order to test the Well, and the IBLA decision upholding it, are arbitrary and capricious.

The Government counters that the BLM's decision to require CIT and production testing is supported by evidence in the record. [Doc. 21 at 7] It points to the BLM's stated reason for requiring the testing: that "a significant number of years have passed by without any further testing of the casing integrity or the [W]ell's capability of being a paying well." [Doc. 21 at 7] It also points to the evidence, considered by the IBLA, that the Well's initial production was categorized as marginal. It asserts that "[i]t is not

unreasonable for the BLM to question the integrity and productive capability of the Well in light of the decades-long period since its last production test." [Doc. 21 at 8]

The order to conduct testing pursuant to §3162.4-2(b) was issued in relation to Cibola's Sundry Notice requesting an extension of the Well's TA status. The Mineral Leasing Act requires a well to be producing or capable of production to avoid the expiration of the lease by operation of law. 30 U.S.C. § 226(i); *Coronado Oil Co.*, 164 IBLA at 321; *Daymon D. Gililland*, 108 IBLA 144, 147 (1989). A lease may be maintained, in suspension, with the permission of the authorized officer. § 3107.2-3. However, as the IBLA properly noted, "even where a well has been shut-in for lack of a pipeline, a well must be capable of production to avoid the expiration of its lease." [AR 525]; *Robert W. Willingham*, 164 IBLA 64, 68-69 (2004). The IBLA reasoned that in such a circumstance, where the well has been shut-in or temporarily abandoned and the lessee seeks to avoid the termination of its lease by extending the period in which a well is in TA status, it is appropriate to require a test to determine the well's current condition and production capacity. [AR 525]. This reasoning is supported by IBLA decisions both in cases where the wells at issue had previously produced and those where wells had been shut in and never produced. *See, e.g.*, *Willingham*, 164 IBLA at 68-69 (remanding to BLM to allow flow test of a well that had produced, but was shut in for lack of a pipeline for nearly two decades to determine whether it was still capable of producing in paying quantities); *Gililland*, 108 IBLA at 147-48 (ordering testing of shut-in wells that had never produced to determine whether they were still capable of producing in paying quantities to maintain the leases); *Byron Oil Industries, Inc.*, 100 IBLA 84 (1988)

(requiring a test pursuant to § 3162.4-2(b) where a previously producing well had been shut in for two years).

To meet the definition of a well capable of production in paying quantities, "a well must be 'physically capable of producing a sufficient quantity of . . . gas to yield a reasonable profit after the payment of all the day-to-day costs incurred after the initial drilling and equipping of the well, including the costs of operating the well, rendering the . . . gas marketable, and transporting and marketing that product."[3] *Coronado Oil Co.,* 164 IBLA at 324 (quoting *Int'l Metals & Petroleum Corp.*, 158 IBLA 15, 22 (2002)). Even where a well is not producing, a lease may be maintained "as long as production can clearly be obtained but has not been because of a lack of pipelines, roads, or markets for the gas." *Id.* at 324.

Importantly, "[t]he phrase, 'well capable of production' means a well which is actually in a condition to produce *at the particular time in question*." *Coronado Oil Co.,* 164 IBLA at 323 (internal quotation marks and citation omitted) (emphasis added). The IBLA's decision reflects this definition as it recognizes that "[w]hether a well is presently capable of production in paying quantities is a determination that depends on the physical and economic circumstances of the well" and that "[t]hose circumstances may change over time." [AR 526] The IBLA considered that for a well to avoid the expiration of its lease, it must be capable of producing in paying quantities even while in temporarily

---

[3] The economic analysis of the instant Well is not currently before the Court. The only issue is whether the IBLA properly affirmed the order to test the well casing and production capability. As the Court understands it, the economic analysis would be the next step after testing. *See Cibola Energy Corp,* IBLA 2012-110 [AR 526]; *see, e.g., Willingham*, 164 IBLA at 69.

10

abandoned status. [AR 525] Although it had the 1990 test before it, the IBLA considered new tests pursuant to § 3162.4-2(b) to be an appropriate mechanism to determine the Well's current state. [AR 525]

Based on those considerations, the IBLA reasoned that the "BLM properly requires a showing as to the productive capability of a well when it is necessary to determine whether the well should be considered temporarily, rather than permanently, abandoned." [AR 526] It applied that reasoning to the facts before it: Cibola sought, for the first time since 2003, TA status for the Well that was last tested for production in 1990 and for casing integrity in 2002.[4] It noted that the Well had produced only marginally and that the BLM was concerned that the physical conditions of the Well had changed. [AR 526]

Cibola argues that it is not reasonable to require testing of the Well when there is no evidence in the record showing that any condition or circumstance surrounding the well and the hydrocarbon reservoir have changed since the last tests. Cibola writes that the "difficulty with the IBLA's conclusion is that nothing has occurred that would conceivably alter or change the physical conditions of the Well since it was completed and since the bridge plug was installed in the wellbore." [Doc. 18 at 12; Doc. 24 at 11] As the Court understands it, Cibola argues that the IBLA failed to consider its assertion that it is impossible there has been any change in the condition of the Well—which had

---

[4] Whether this test was conducted in 1990 or 1998 as the IBLA stated is immaterial to the Court's review. The only results in the record for the IBLA to consider were those from 1990. The IBLA appears to have misread the 1998 letter referring to those results. However, the IBLA considered the thirteen or so years that had passed since 1998 to be a significant period of time in itself and long enough to warrant more testing.

11

been found to be capable of production in paying quantities—when the Well has not produced and there has been no drilling in the area.

There are several problems for Cibola here. First, contrary to Cibola's argument, the IBLA appears to have considered and rejected Cibola's assertions that testing was unreasonable because changes to the Well were impossible under the present facts. In describing Cibola's arguments, the IBLA acknowledged Cibola's contentions. [AR 524] The IBLA then stated that the "BLM reasonably requires tests in lieu of inferences and assumptions regarding the Well's present production capability." [AR 526] It explained that "it had been many years since the last tests on a marginally productive well" and that the BLM was concerned with "whether the physical conditions of the well have changed." [AR 526]

A second problem underlies the first. At the hearing, it was Cibola's burden to show by a preponderance of the evidence that the BLM's decision and order were incorrect. *Bender v. Clark*, 744 F.2d 1424, 1429 (10th Cir. 1984) (stating the standard of proof). The theory Cibola relied on to challenge the BLM's decision is that testing is not necessary because the Well had already been tested and there had been no changes in the conditions or circumstances of the Well. However, Cibola does not point to evidence in the record supporting its contention that changes in the Well in twenty years are impossible. The IBLA indicated this problem by referring to "inferences and assumptions" that it declined to rely on. It was up to Cibola to establish facts showing that the Well was capable of producing in paying quantities. *See, e.g., Gililland*, 108 IBLA at 148 (stating that at a hearing the appellant has "the burden of going forward with

the evidence and the ultimate burden of establishing the existence of a well capable of producing gas in paying quantities"); *John Swanson*, 51 IBLA 239 (1980) (stating that "[a]t [a] hearing the burden of going forward with the evidence and the ultimate burden of proof falls on the appellant and/or the lessees who must establish the existence of a well capable of production in paying quantities").

What is significant, and not disputed by the parties, is that the most recent CIT and production tests performed on the Well were approximately ten and twenty years, respectively, prior to the BLM's request for testing. [AR 364-367] The Court acknowledges that the Well has never produced, that it appears that no other leases have been granted in the area since 1997, that no other wells have produced in the area, and that no gas was being produced in Otero County. It further acknowledges that the Well was shown to be capable of production in paying quantities in 1990, and was implicitly considered so in 2002 and 2003 when it was granted TA status. However, there is nothing in the record *explaining* why these facts support the Cibola's conclusion that the production capacity of the Well is exactly as it was in 1990, and the casing integrity exactly as it was in 2002.[5] There does not appear to be evidence in the record supporting

---

[5] The evidence to which Cibola points in support of its assertion that there have been no changes to the Well do not support its assertion. For instance, AR 247, which Cibola cites to support the statement that "[t]he well continues to be located in a virgin gas reservoir because it is the only well in the area," is a 2002 letter from Cibola to the BLM accompanying the 2002 Sundry Notice requesting TA status. This TA status was granted *after* Cibola performed a casing integrity test. [AR 239] Neither the letter, nor the grant of TA status in 2002 support Cibola's contention that nothing had changed in the downhole status as of 2011. Nor can the Court find any evidence in the record regarding the perpetual soundness of the casing integrity. At the administrative hearing, the only

13

Cibola's contention that it is inconceivable that there has been any change in the Well or reservoir, and the Court cannot rely on the briefing or the argument of counsel alone. [Doc. 18 at 13-14; Doc. 24 at 4-5, 11-12] Moreover, the condition of this Well does not appear to have been the focus of Cibola's presentation at the hearing. *See* [AR 551-561(transcript); AR 405-410 (memo from Mr. Yates for 12/16/11 hearing)] While Cibola urges that it is "elementary" that there has been no change in the Well, it was its burden to demonstrate this to the IBLA. [Doc. 24 at 4-5] The record reflects that the Well was a marginally producing "wildcat well" when it was tested for one hour approximately twenty years prior to the BLM's Notice of Written Order. [AR 98] Beyond that, the productive capability of the Well remains unknown. The record also reflects that the IBLA heard and considered information about the state of gas production in the area surrounding the Well. The record reflects that the IBLA considered all the data, and relied on this relevant data to uphold the BLM's decision as reasonable.

Cibola challenges the IBLA's finding that the BLM was concerned with the passage of time and the condition of the Well. [Doc. 18 at 13] It calls this "speculation" and asserts that there are no facts that would justify concern about the physical condition of the well. [*Id.*; Doc. 24 at 11] The Court is not persuaded. The Notice of Written Order identifies the problem to be addressed, stating "a significant number of years have passed without testing of the casing integrity or the [W]ell's capability of being a paying well." [AR 179] This is evidence that the BLM was concerned both with possible

---

discussion of the casing integrity occurs when Mr. Yates offered to have it tested. [AR 556]

changes that could have occurred in the intervening decades and the effect of time (and any unknown intervening factors) on the physical condition of the Well. Although Cibola argues that change in the Well condition is impossible, without more, the IBLA's decision that the BLM reasonably required testing of the Well to determine the Well's current condition cannot be said to be arbitrary and capricious. *Cf. Gililland*, 108 IBLA at 146-148 (ordering the testing of shut in wells that had never produced, even when lessee offered technical evidence of the wells' production capabilities, in order to establish whether the wells were capable of production in paying quantities to determine whether the leases should be extended).

The Court recognizes that the facts before the IBLA here are different from those in *Willingham* and *Byron* where there was a question of whether a well that had once produced was still capable of production in paying quantities. In *Willingham*, in order to avoid the termination of its lease, a lessee with a shut in well which had previously produced sought the opportunity to test its present production capability. *Willingham*, 164 IBLA at 65-69. *Byron* involved a well that had also produced and was shut in. There, the BLM ordered testing pursuant to § 3162.4-2(b) in order to determine whether the well was still a paying well. *Byron*, 100 IBLA at 86. The test was inconclusive and the BLM ordered a second round. *Id*. The operator objected and argued that the well had previously been tested and found to produce in paying quantities and another test would show just that. *Id.* at 87. The IBLA rejected this argument and reasoned that requiring another test under § 3162.4-2(b) was a common sense approach to resolving the factual issue. *Id.* at 87-88.

15

Here, the Well has never produced and little is known about the state of the reservoir. The determination that the Well was capable of producing in paying quantities was made after an hour-long test two decades before the BLM order for new testing, and even at that time the Well's production was considered marginal. The point of the testing is to determine whether there are unknown changed conditions or circumstances in order to allow the BLM to decide whether to extend the lease in TA status. Testing is a reasonable method of making this determination and the regulation provides the BLM with the authority to utilize this method. *See, e.g.*, *Gililland*, 108 IBLA at 148; *Byron*, 100 IBLA at 88.

Both parties raise issues regarding the lack of oil and gas leases in Otero County and the economic viability of building a ten-mile pipeline for this Well when there are no other wells in the area, as well as Cibola's plans for oil and gas development in Otero County. These issues do not bear on whether it was appropriate for the BLM to order testing of the long-abandoned Well under § 3162.4-2(b); therefore, the Court does not address them.

## CONCLUSION

The Court concludes that the IBLA's decision sets out a reasoned basis for concluding that the BLM properly required testing under § 3162.4-2(b) to determine the present status of the Well. Given the passage of time, the required casing integrity and production tests were necessary to demonstrate the present conditions of the Well. These directives were reasonable under the circumstances and authorized by, and in compliance with, regulations. The Decision was reasoned, it considered the facts in the record, it did

not ignore data important to the problem, and was made within the scope of the agency's authority. The Court therefore concludes that it is supported by substantial evidence, is not otherwise arbitrary and capricious, and does not constitute an abuse of discretion.

**WHEREFORE**, for the foregoing reasons the IBLA's decision in *Cibola Energy Corporation*, IBLA 2012-110, is affirmed. The cause is remanded to the agency for any necessary further proceedings in accordance with this Order.

**SO ORDERED** this 23rd day of May 2018.

_____
M. CHRISTINA ARMIJO
United States District Judge